### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **KIMBERLY R. BLUITT**, | § | |
| | § | |
| *Plaintiff,* | § | |
| VS. | § | CIVIL ACTION 4:14-CV-0115 |
| | § | |
| **CAROLYN W. COLVIN,** | § | |
| Acting Commissioner of Social | § | |
| Security Administration, | § | |
| | § | |
| *Defendant.* | | |

### MEMORANDUM AND ORDER

In this case seeking judicial review of the denial of Social Security benefits, Plaintiff Kimberley R. Bluitt ("Bluitt") filed a Motion for Summary Judgment pursuant to 42 U.S.C. § 405(g).  Dkt. 7.  Defendant Carolyn W. Colvin ("Commissioner"), Acting Commissioner of Social Security, filed her own Motion for Summary Judgment and Brief in Support.  Dkt. 11.  The parties have consented to have this Court conduct all proceedings, pursuant to 28 U.S.C. § 636(c).  Dkt. 10.  Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court **ORDERS** that Bluitt's Motion for Summary Judgment is **DENIED** and that the Commissioner's Motion for Summary Judgment is **GRANTED**.

### BACKGROUND

Bluitt is a 38-year old woman with a high school education.  Tr. 34.  She has past relevant work experience as a prison guard, as a receptionist, and some part-time work in sales.  Tr. 34, 37, 40.  Bluitt claims to suffer from lupus, high blood pressure, Raynaud's

disease, acid reflux, depression, fluid around her heart, and potassium deficiency. Tr. 193.  On April 27, 2011, Bluitt filed a Title II application for a period of disability and disability insurance and a Title XVI application for supplemental security income benefits.  Tr. 79-80.  Bluitt alleges her disability began on September 24, 2010.  *Id.*

***Medical Evidence***

Bluitt has a recorded past medical history of gout, lupus, arthroscopic left knee surgery, hypertension, postpartum depression, and pneumonia.  Tr. 348.  Bluitt reported that she was diagnosed with Raynaud's disease in 2000, lupus in 2008, and had knee surgery in 2006.  Tr. 500, 609.

Bluitt has a regular history of treatment from early 2005 through mid-2011 with Dr. George Simpson at the Westbury Medical Clinic.  Tr. 619-46.  The medical records for each of these visits are represented by a single page of largely illegible handwritten notes and checkmarks.  While many of these visits were for "routine" complaints such as nausea, coughing, and a sore throat, other visits contained complaints of swelling, lupus exacerbation, anxiety, depression, hand pain, back pain, chest pain, and/or high blood pressure.  Tr. 465, 619-46.  While Dr. Simpson's treatment notes include prescriptions for a variety of medications, the medical evidence for these visits does not include the results of any diagnostic tests or records of hospitalizations.

On September 11, 2010, Bluitt was admitted to Oakbend Medical Center complaining of back pain.  Tr. 424.  The record does not contain the history or any other treatment notes associated with this visit.

Approximately six weeks later, on October 23, 2010, Bluitt again went to Oakbend Medical Center complaining of post-partum depression (7 days post-partum), chest pain, and shortness of breath.  Tr. 337-38.  Bluitt reported that "the symptoms began shortly after her first dose of [a recent prescription for] Effexor."  Tr. 348.  Bluitt's physician noted that she appeared "very anxious and worried," but that she was "reassured [and] medicated."  Tr. 338.  Bluitt's blood pressure was measured at 161/96.  Tr. 349.  A chest x-ray and CT scan "showed evidence of CHF with interstitial edema," while an echocardiogram revealed a "very small pericardial effusion."  Tr. 343-44, 350, 352.  Bluitt was diagnosed with hypertensive urgency, a fluid overload state, a postpartum state, and a history of systemic lupus erythematosus.  Tr. 344.  It was noted that she currently took Lisinopril and Metroprolol and that her "[h]ypertension may have been exacerbated by Effexor."  Tr. 340-44.  "Ativan was also added for symptomatic relief of anxiety which appeared to improve her pressures considerably."  Tr. 344.  However, Bluitt was discontinued on Effexor "because of its blood pressure effects."  Tr. 350.  On October 26, 2010, Bluitt's physician stated that, "[b]ecause she is doing so well clinically with significant improvement in her pressures and no evidence of fluid overload, she is felt stable for discharge today."  Tr. 344-45.

On June 21, 2011, Bluitt again went to Oakbend Medical Center complaining of "some pressure in my chest" for the last two days as well as joint pain for weeks.  Tr. 331.  Although Bluitt was diagnosed and treated for a urinary tract infection (cystitis), a chest CT revealed "[n]o acute cardiopulmonary abnormality."  Tr. 535, 391.  Bluitt was given medication and discharged that same day in "good" condition.  Tr. at 332-34.

3

On August 19, 2011, Bluitt was again seen at Oakbend Medical Center complaining that she "hurts all over." Tr. 579. She was diagnosed with uncontrolled hypertension due to medical non-compliance, joint/extremity pain, and exacerbation of systemic lupus erythematosus. Tr. 586. Bluitt was given an intramuscular steroid injection and discharged in "good" condition that same day. Tr. 580-82. Approximately two weeks later, on September 4, 2011, Bluitt again went to Oakbend Medical Center complaining of chest pain. Tr. 564. She was examined, administered medication, and discharged that same day in "good" condition. Tr. 565-67.

On December 27, 2011, Bluitt was seen at Oakbend Medical Center complaining of her "lupus flaring up" and body, finger, and shoulder pain. Tr. 654. X-rays of Bluitt's chest and right hand revealed "no acute abnormality." Tr. 657-58. The medical record does not indicate whether or not Bluitt received any treatment for these complaints. Similarly, on March 5, 2012, Bluitt was seen at Oakbend Medical Center complaining of nosebleeds, that "all her joints hurt," and that "her lupus is flaring up." Tr. 651. It was noted that "[Bluitt] is out of pain meds + BP meds." *Id.* The medical record does not indicate what, if any, treatment was recommended.

On July 11, 2012, Bluitt was referred to Huma Sohail, M.D., for evaluation and treatment of her lupus. Tr. 712. Dr. Sohail noted that Bluitt "never received any pharmaceutical treatment for [her Raynaud's disease] and symptoms remained stable over [the] years." *Id.* Dr. Sohail also noted that Bluitt started to experience lupus symptoms in 2003, was diagnosed in 2007, and "followed up with rheumatology for a year but due to loss of insurance, no [follow-up] was arranged." *Id.* However, Dr. Sohail

4

also stated that Bluitt has "had several ED visits and each time was prescribed different doses of steroids which were very effective in controlling the acute episodes but symptoms flared at discontinuation." *Id.*

Dr. Sohail ordered a chest x-ray, which revealed "[n]o acute cardiopulmonary abnormalities." Tr. 698. Similarly, x-rays of Bluitt's hands revealed "[m]inimally decreased periarticular bone mineralization. Otherwise, unremarkable bilateral hand series." Tr. 715. Dr. Sohail's overall assessment was of systemic lupus erythmatosis and fibromyalgia. Tr. 714. Dr. Sohail noted that she "advised her to continue Celexa 10 mg for now [and that she] would reevaluate her treatment for fibromyalgia once her inflammatory joint pain is well controlled." *Id.*

### *Application for Benefits and Consultative Exams*

On April 27, 2011, Bluitt applied for social security disability insurance benefits ("SSDI") and supplemental security income benefits ("SSI"), claiming a disability onset date of September 24, 2010. Tr. 79-80. Her application was initially denied on August 26, 2011, and again upon reconsideration on January 19, 2012. Tr. 85, 96. Bluitt requested a hearing before an administrative law judge ("ALJ") on January 24, 2012. Tr. 102-04.

On July 8, 2011, Bluitt visited Cecilia Lonnecker, Ph.D., for a clinical interview of her mental status. Tr. 500. Dr. Lonnecker recorded that, ever since the October 2010 birth of her child,

> [Bluitt] has gotten to the point where she cannot deal with things. She has had decrease in sleep and coping abilities. . . . She feels depressed and anxious and has been on and off medication since 2008. She reports that she has a hard time

> sleeping because of pain and also worrying about her children. She feels guilty.
> She has never had suicidal thoughts and has never had psychotic symptoms. . . .
> She had also been given Zoloft for 3-4 months.

Tr. 500-01. Bluitt described her social functioning as "quite limited" and stated that she does not have any social activities. Tr. 501. She also said that she feels embarrassed and uncomfortable because her joints swell, she has a limp, and her teeth are broken. *Id.* Bluitt stated that she lives with her children and is able to cook, perform household chores, and independently care for her personal hygiene and grooming. *Id.* She also stated that, if she does experience difficulty completing tasks timely and appropriately, it is due to "pain and worry." *Id.* However, Bluitt also reported that she "cannot do what she used to do and has no motivation." *Id.* While Bluitt has never been hospitalized for a mental health issue, she has been treated on an outpatient basis. *Id.*

Based upon her examination, Dr. Lonnecker estimated that Bluitt was of "low average" intelligence. Tr. 504. Bluitt was diagnosed with anxiety disorder and assigned a GAF score of 65. *Id.* Dr. Lonnecker opined that Bluitt's "[p]rognosis was fair with treatment. The claimant may benefit from following the directives of her healthcare team. She may also benefit from vocational placement compatible with her heath issues." *Id.*

On August 1, 2011, Leela Reddy, M.D., completed a Psychiatric Review Technique. Tr. 717-30. Dr. Reddy analyzed Bluitt's mental impairments using the criteria in Listing 12.06 Anxiety-Related Disorders. Tr. 717. Dr. Reddy concluded that while Bluitt has anxiety disorder, her "medically determined impairment [] does not precisely satisfy the diagnostic criteria [of Listing 12.06]." Tr. 722. Bluitt was found to

6

have "mild" restrictions in her activities of daily living, "mild" difficulties in maintaining social functioning; and "mild" difficulties in maintaining concentration, persistence, or pace. Tr. 727. However, Bluitt was found to have experienced no extended episodes of decompensation. *Id.* Dr. Reddy found that the "[e]vidence does not establish the presence of the [paragraph] 'C' criterion." Tr. 728. As a result, Dr. Reddy concluded that Bluitt's mental impairments were "not severe." Tr. 717. Bluitt was found to be "fully orientated," her reliability was found to be "fair," and her thought processes "relevant, logical, and coherent." Tr. 729. Bluitt's mood was recorded as "depressed and anxious," while her "affect was mood congruent." *Id.* Dr. Reddy diagnosed Bluitt with anxiety disorder, assigned a GAF score of 65, and found her prognosis to be "fair." *Id.* Dr. Reddy noted that Bluitt was "limited by physical condition mostly." *Id.*

On August 25, 2011, a Physical Residual Functional Capacity Assessment was performed by John Durfor, M.D. Tr. 539-46. Bluitt was found able to "occasionally" lift and/or carry up to 50 pounds, while "frequently" able to lift and/or carry up to 25 pounds. Tr. 540. Bluitt was found able to stand, walk, or sit about 6 hours in an 8-hour workday, and to have an "unlimited" ability to push and/or pull. *Id.* Dr. Durfor found Bluitt's allegations and limitations were "partially supported" by the record. Tr. 544.

On January 10, 2012, Bluitt went for a consultative exam with Ricardo Adames, M.D. Tr. 609-11. Bluitt's chief complaint was pain and swelling in her hands and pain in her whole body. Tr. 609. She also complained of depression, headaches, loss of sleep, weight loss, nervousness, nosebleeds, ringing of the ears, sinus problems, vision flashes, chest pain, high blood pressure, poor circulation, poor appetite, bowel changes, bruising

7

easily, itching, rash formation, and pain in her arms, back, feet, hands, hips, legs, neck, and shoulders.  Tr. 610.  Dr. Adames recorded that, "at the present time [she] is not under any medical follow-up due to financial reasons and when she gets sick she gets medical attention in the emergency room."  Tr. 609.  Bluitt's blood pressure was measured at 140/80 while her weight was found to be 286 pounds.  Tr. 610.  X-rays of Bluitt's right hand and chest revealed "no acute abnormality."  Tr. 611-13.  An exam of Bluitt's extremities revealed that,

> On the lower extremities, there is no edema and no calf tenderness.  All joints of the lower extremities reveal a full range of motion without tenderness or deformity.  On the upper extremities, the hands appear to be mildly swollen, but there is no evidence of any deformities of the fingers and the patient is able to grab and hold objects with no impairment at the present time.

Tr. 611.

### ALJ Hearing

A hearing took place on August 10, 2012 before ALJ Allen Erickson.  Tr. 29.  The ALJ heard testimony from Bluitt, who was present with counsel, and from impartial vocational expert ("VE") Herman Litt.  Tr. 30-78.

Bluitt testified that she has a high school education and prior work experience as a prison guard, as a receptionist, and some part-time work in sales.  Tr. 34, 37, 40.  Bluitt also stated that she completed a medical assistant program, but that she never found a job in the field because they "want you to be bilingual."  Tr. 34-35.  Although Bluitt acknowledged that she had previously received unemployment benefits and had certified that she was "ready, willing, and able to work, [but] just can't find it," she testified that

8

she was looking for a job that would be "willing to understand" her medical situation and

adjust accordingly.  Tr. 38-39.

> Bluitt testified that she left her last job because

> I couldn't get up, I was having problems with just standing, even walking from my
> bedroom to the bathroom, and my hands was staying so swollen and blue.  . . .
> But then it started getting to the point where all my joints and all my fingers
> are just big, you know.  I can't even close them, I can't do simple things as [] just
> going to the restroom and doing what I need to do. . . .  [I]t's like I'm fighting to
> so something basic and it was hard.  I couldn't go back to work with none of that.

Tr. 41-42.  The ALJ noted that, shortly after the birth of her baby, Bluitt went to the

hospital for "chest pains and issues" in October 2010.  Tr. 42-43.  When asked why she

did not receive any further treatment until June 2011, Bluitt responded that,

> When I had the baby. . . I'm not knowing what's going on with me.  All I know is
> I'm taking pain medication.  I was having a few pains, [] and I would take pain
> medication and it was getting to the point where it had stopped, where it's not
> working.  My daughter was doing more nurturing of my baby, holding my baby.  I
> was putting a strain on her.  . . .  I couldn't hold her.  I mean my legs, when I had
> my baby, it took a complete 360.  Every [] bone in my body that I could tell you
> that I walk around, it hurts.  I've never been in no pain like this.  That pain that I
> have now, it's horrible.

Tr. 44-45.  When the ALJ pressed for further answers, Bluitt replied that, "everybody

used to tell me to go to the emergency room.  Kim don't worry about the bill.  Well, I

was worried about it.  Didn't have no insurance coverage.  I tried to go to one of those

clinics.  I try to do the indigent thing." Tr. 45-46.  She further responded that,

> If [the emergency room] keep[s] me, then who's going to keep the baby, you
> know? . . .  I had nobody else to lean on.  . . .  I feel helpless at times or
> something, [] because I don't know what else to say.  I've never had this much
> pain in my hands, my legs, my body.  It feels like a truck hit me sometimes.

Tr. 48-49.

When asked if she takes medication to treat her lupus, Bluitt testified that she "just got on some medication recently with my doctor that I just started seeing, a rheumatologist." Tr. 49. Bluitt further testified that she just recently got Medicaid coverage and that soon afterwards she was "doing whatever I could to find a rheumatologist because I know that they [are] the only person that [can] treat me." Tr. 50. Bluitt also stated that, "[i]f I'm on the steroids, I don't hurt as much . . . I'm able to do [] the normal things. I have a little control over it. A little bit more. The pain may not be as much. . . . You feel normal, that's the only time that you'll feel normal." Tr. 64-65. Bluitt testified that the steroid packs "can last up to a week or two weeks," but that long term use causes other health problems with her "diabetes and things like that." Tr. 65.

When asked about her January 2012 consultative exam, Bluitt stated that it was "a relatively good day" and that she was not swollen during the exam. Tr. 52. Bluitt further testified that she has "bad days" six days a week. *Id.* When asked how she handles caring for her children and dealing with her illnesses, Bluitt responded that, "[s]ometimes I can't handle it. I shut the door and I turn the lights off and I just cry until I get it together." Tr. 54.

Bluitt testified that her sister or her aunt "usually come and try to clean up and help me sometimes whenever they can. If I try to get up and wash the dishes, it will go undone." Tr. 56. Bluitt also testified that she can no longer cook and requires help combing her hair and putting on her shoes and socks. Tr. 71, 76. Bluitt stated that her landlord takes care of her yard and that her sister, aunt, or daughter helps her with the

shopping.  Tr. 57-59.  Bluitt testified that she tries to walk to the mailbox, but that "[it's] a challenge for me."  Tr. 61.  Bluitt also testified that "sometimes I can't [] drive or ride because of the pain" and that it can sometimes take 30 minutes to an hour just to "walk to the car [and] lift my legs up and position myself to get in."  Tr. 63.  Bluitt testified that she goes to church "when I'm able to."  Tr. 66.  Although not prescribed, Bluitt stated that, for the last four or five months, she uses a cane "to help my shoulders and stuff when I can't get up and down."  Tr. 68-69.

When asked about her mental impairments, Bluitt testified that, "I think it [has] a lot to do with what I'm going through, you know, dealing with stuff every day.  . . . [Y]ou have to be dependent on somebody or have to wait, and it's changed.  It's just everything has changed.  I mean, I don't have no social life anymore."  Tr. 60.  Although she admitted that she has not seen a psychiatrist, Bluitt testified that she takes "citroprams or something like that" to treat her mental health issues and that she takes it "when I'm able to get it [because of finances]."  Tr. 61.

 Bluitt also testified about her Reynaud's disease and how "sometimes [her hands] turn blue to the point where they get numb or they have tingling in it and I have to [] rub it or I sit on them or something to keep the pain from coming.  Sometimes I might get [] a little sore, [] they call them ulcers or something."  Tr. 67.  Bluitt stated that her Reynaud's disease affects her ability to grip with her hands and that sometimes, because of the numbness and pain, she is unable to use them.  Tr. 68.  When she is affected, the symptoms can persist for minutes or up to three hours.  *Id.*  Bluitt testified that she

11

experiences symptoms from her Reynaud's disease "all the time," including during the hearing.  *Id.*  Bluitt then demonstrated her blue hands.  *Id.*

VE Litt testified that, according to the DOT, Bluitt's past work as a "correctional officer" was medium, semi-skilled work, while her work as a receptionist was sedentary, semi-skilled work.  Tr. 36, 39.  VE Litt testified that Bluitt would be able to perform her past relevant work if she was limited to medium work with the ability to occasionally climb ladders, ropes, and scaffolds.  Tr. 72.  VE Litt further testified that Bluitt could perform her past relevant work—as actually performed—if limited to light work with the ability to occasionally climb stairs and ramps; occasionally crawl; frequently, but not continuously, handle and finger bilaterally; and with occasional exposure to vibrations or to extreme temperatures and humidity.  Tr. 73.  If these limitations were then altered to sedentary work, with no crawling whatsoever and only occasional bilateral overhead reaching, VE Litt testified that Bluitt could still perform her past relevant work as a receptionist.  Tr. 73-74, 77.

However, the VE also testified that, if Bluitt needed to miss at least two workdays per month due to her impairments, she would be unable to maintain full-time employment.  Tr. 74.  Likewise, if Bluitt needed to take two or more breaks each day of 15-20 minutes each, she would also be unable to maintain full-time employment.  *Id.*  Upon cross-examination, VE Litt testified that, if Bluitt was limited to sedentary work, but could never crawl and only occasionally perform handling and fingering tasks, then Bluitt would not be able to perform her past relevant work.  Tr. 75.  Furthermore, the VE testified that such limitations would "pretty much eliminate all the jobs."  *Id.*

12

***The ALJ Decision***

After the hearing, the ALJ issued a decision that Bluitt was not disabled from September 24, 2010 through the September 28, 2012 decision date.  Tr. 8-22.  The ALJ found that Bluitt met the insured status requirements of the Social Security Act through March 31, 2012.  Tr. 13.  The ALJ also found that Bluitt had not engaged in substantial gainful activity since her alleged onset date, and suffers from the "severe" impairment of systemic lupus erythematosus.  *Id.*  The ALJ specifically noted that Bluitt had the following "non-severe" impairments: hypertension, Raynaud's disease, GERD, cystitis, pulmonary edema, potassium deficiency, obesity, depression, and anxiety disorder.  *Id.*

The ALJ next found that none of Bluitt's impairments, alone or in combination, met or medically equal the severity of a Listing found in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1").  Tr. 17.  In reaching his conclusion, the ALJ specifically considered Immune System Disorders Listing 14.02 - Systemic lupus erythematosus.  Tr. 16-17.  The ALJ evaluated Bluitt's residual functional capacity ("RFC"), and found that she retained the ability to perform the full range of medium work, but could only occasionally climb ladders, ropes, and scaffolds.  Tr. 17.  Based on this RFC, Bluitt was found able to perform her past relevant work as a security guard and receptionist.  Tr. 21.  Accordingly, the ALJ held that Bluitt was not under a disability as defined in the Social Security Act from September 24, 2010 through the September 28, 2012 date of the decision.  Tr. 21-22.

Bluitt requested a review of the ALJ's decision on September 28, 2012, and submitted additional evidence, which the Appeals Council considered and made a part of

the record.  Tr. 1, 5.  The Appeals Council denied review on November 18, 2013.  Tr. 1.

Bluitt now appeals to this Court, filing a motion for summary judgment arguing that the

ALJ's decision was in error.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); *Curtis v.

Anthony*, 710 F.3d 587, 594 (5th Cir. 2013).  Summary judgment "should be rendered if

the pleadings, the discovery and disclosure materials on file, and any affidavits show that

there is no genuine issue as to any material fact and that the movant is entitled to

judgment as a matter of law."  *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir.

2008); FED. R. CIV. P. 56(a), (c); *Celotex Corp.*, 477 U.S. at 322-23.   "An issue is

material if its resolution could affect the outcome of the action.  A dispute as to a material

fact is genuine if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."   *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005)

(internal citations and quotation marks omitted).

## STANDARD OF REVIEW

Judicial review of the Commissioner's final decision that a claimant is not entitled

to benefits is governed by 42 U.S.C. § 405(g).  *Waters v. Barnhart*, 276 F.3d 716, 718

(5th Cir. 2002).  This review is limited to two issues: "(1) whether the decision is

supported by substantial evidence on the record as a whole, and (2) whether the Commissioner applied the proper legal standard." *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005)

Substantial evidence is "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); *Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007). A finding of substantial evidence supporting the Commissioner's decision must "do more than create a suspicion . . . of the fact[s] to be established," while a finding of no substantial evidence is only appropriate if there is a conspicuous absence of "credible evidentiary choices or medical findings" to support the decision. *Richard ex rel. Z.N.F. v. Astrue*, 480 F. App'x 773, 776 (5th Cir. 2012); *Stringer v. Astrue*, 465 F. App'x. 361, 363-64 (5th Cir. 2012). In applying this standard, the court "may not reweigh the evidence or substitute our judgment for that of the Commissioner." *Audler*, 501 F.3d at 447.

## ANALYSIS

### A. Statutory Basis for Benefits

Bluitt applied for both Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits. SSDI benefits are authorized by Title II of the Social Security Act. The disability insurance program provides income to individuals who are forced into premature retirement, provided they are both insured and disabled. *See* 42 U.S.C. § 423(a). SSI benefits are authorized by Title XVI of the Social Security Act. This program assures a minimal level of income to the aged, blind, and

15

disabled to assure that their standard of living does not fall below the poverty line. 20 C.F.R. § 416.110; *see also* 42 U.S.C. § 1381.  Eligibility for SSI is based upon proof of disability and indigence.  *See* 42 U.S.C. § 1382.  "The law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI."  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); *see also* 42 U.S.C. §§ 423(d), 1382c(a)(3)(A).

## B. Determination of Disability

The Social Security Act defines the term "disability" to mean the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  A claimant is disabled "only if his physical or mental impairment[s] are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis of a disability claim to determine whether: (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in Appendix 1 of the Social Security Regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity.  *See Audler*, 501 F.3d at 447-48; 20 C.F.R. § 404.1520(a).  If,

16

at any step, a conclusive disability determination can be made, the inquiry ends. *Id*. The burden of proving disability initially lies with the claimant, but shifts to the Commissioner to show that the claimant can perform other substantial work in the national economy. *See Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). Once the Commissioner makes this showing, the burden shifts back to the claimant to rebut this finding. *See Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

Bluitt asserts a series of errors that she contends entitle her to summary judgment. The Court addresses her arguments below.

## C. The ALJ Correctly Determined Bluitt's Severe Impairments

Bluitt challenges the second step in the Commissioner's disability determination, which requires the ALJ to decide whether her impairment(s) are "severe" irrespective of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c). The ALJ found that Bluitt suffers from the "severe" impairment of systemic lupus erythematosus. Tr. 13. The ALJ also found that Bluitt's hypertension, Raynaud's disease, GERD, cystitis, pulmonary edema, potassium deficiency, obesity, depression, and anxiety disorder were not "severe" impairments. *Id.* Bluitt argues that this determination "def[ies] both common sense and the clear evidence of the record." In a related argument, Bluitt also asserts that the ALJ failed to consider the combined effects of her impairments. The Court disagrees.

"[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."

17

*Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985) (alterations in original); *Henderson v. Colvin*, 520 F. App'x 268, 274 (5th Cir. 2013).  All impairments must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).  In the applicable law section of his decision, the ALJ correctly set forth the *Stone* standard.  Tr. 12.  The ALJ then applied *Stone* to find that systemic lupus erythematosus "cause[d] significant limitations or restrictions that have more than a minimal effect on [Bluitt's] ability to perform basic work-related activities" and was therefore "severe."  Tr. 13.

Contrary to Bluitt's assertions, the ALJ comprehensively outlined the reasoning and evidence supporting his findings.  *See Beck v. Barnhart*, 205 F. App'x 207, 211 (5th Cir. 2006) ("[T]he examining ALJ must analyze the disabling effect of both the claimant's ailments individually and for their cumulative impact.").  For example, the ALJ found that,

> The record shows a history of asymptomatic hypertension.  The claimant's blood pressure has been well-controlled on medications without any complaints of headaches, dizziness, or syncope.  The claimant has reported a history of Reynaud's disease, but there is no longitudinal history of treatment or complications from the impairment. . . .  [T]he claimant's potassium deficiency has not resulted in weakness, muscle cramps or other physical manifestations to support a severe impairment.  The claimant had a short stint of pulmonary edema that was not apparent in follow-up exams.  Additionally, the claimant's GERD is apparently well controlled with medication as the record scarcely mentions it. . . . [T]he claimant's obesity, in combination with her other impairments, imposes no further functional limitation on her ability to sit, stand, walk, lift and carry on a sustained basis in a competitive work environment.

Tr. 14 (internal citations omitted).

Likewise, the ALJ thoroughly examined Bluitt's mental impairments. When assessing the severity of mental impairments, the Commissioner "must follow a special technique at each level in the administrative review process." 20 C.F.R. § 404.1520a(a). Using this "special technique," the Commissioner is required to: (1) evaluate the pertinent symptoms, signs, and laboratory findings to determine any mental impairments; (2) rate the degree of functional limitation resulting from these impairments; (3) determine the severity of mental impairments; and (4) document application of the technique. *Id.* § 404.1520a(b)-(e). The Commissioner will rate a claimant's degree of functional limitation in four broad categories: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *Id.* § 404.1520a(c)(3); *see also* Appendix 1 § 12.00(C). The first three categories are rated on a five point scale using the descriptors: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). Episodes of decompensation are rated on a four point scale consisting of: none, one or two, three, and four or more. *Id.* The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. *Id.* If the claimant's rating is "mild" or less in the first three functional areas and "none" in the fourth, the Commissioner will conclude that the mental impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." *Id.* § 404.1520a(d)(1).

Here, the ALJ found that there was "no evidence that [Bluitt's] depression and anxiety has resulted in more than mild restrictions of activities of daily living, no

difficulties in maintaining social functioning, and mild difficulties maintaining

concentration, persistence or pace.  The record also contains no evidence of any episodes

of decompensation." Tr. 16.  Supporting these findings, the ALJ reasoned that,

> [T]here is no evidence of psychotic symptoms, suicidal ideation, or serious deficits
> in memory or concentration that would preclude engaging in substantial gainful
> activity.  The claimant has not [been] treated with a psychiatrist and is receiving
> anti-depressant medication from a general practitioner. . . .  Socially, she spent
> time with others, but indicated that people did not understand her pain.  However,
> there is no evidence of difficulty dealing with the public, isolation, withdrawal, or
> need to be accompanied when going out because of psychological issues. . . .  The
> claimant reported difficulty completing tasks; however, her difficulties were due
> to pain and not because of mental symptomology.  There is no evidence of
> ongoing mental deficits that would preclude complex or detailed tasks. . . .  As far
> as activities of daily living,. . . [s]he could cook and perform household chores.
> She cared for her personal hygiene and grooming needs independently. . . .  [T]he
> statements regarding her independence with personal care and ability to perform
> household chores are in stark contrast to the extreme limitations alleged in her
> Function Report.

Tr. 14-15.

Although Bluitt asserts that the ALJ should have found additional "severe"

impairments, the objective medical evidence does not support such a conclusion.  The

Court notes that Bluitt points to no evidence that the ALJ failed to consider, offers no

substantive argument as to why the ALJ's decision was deficient, and does not indicate

how this alleged deficiency would have changed the result.  Bluitt bears the burden of

establishing any "severe" impairment.  *See Henderson v. Colvin*, 520 F. App'x 268, 275

(5th Cir. 2013).  Bluitt has failed to meet this burden.  Accordingly, the Court finds that

substantial evidence supports that ALJ's determination of Bluitt's "severe" impairments.

In a related argument, Bluitt asserts that the ALJ failed to consider all of her

medically determinable impairments in formulating her RFC and in questioning the VE.

*See* 42 U.S.C. § 423(d)(2) ("If the Commissioner [] does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.").  The Court finds that, for the reasons stated above, these bare and unsupported assertions must also fail.

**D. An Additional Expert Medical Opinion was not Required**

Bluitt also argues that the ALJ should have consulted an additional medical expert to opine about Bluitt's potential qualification under an Appendix 1 listing.  In a similar argument, Bluitt claims that lack of an additional medical expert opinion constitutes reversible error for a failure to adequately develop the record.  The Court finds these arguments unpersuasive.

***An Updated Medical Opinion Would not have Found Bluitt Disabled***

Bluitt, relying upon Social Security Regulation 96–6p ("SSR 96-6p"), argues that "when the file contains medial evidence that may have a bearing upon a 'Listing' level severity and that evidence was received after the most recent state agency review, the ALJ must seek the counsel of an appropriately trained medical expert."  However, as numerous courts have held, the Social Security Regulations create no such duty.[1]  *See* SSR 96-6p, 1996 WL 374180, at *4 (July 2, 1996) (an updated medical expert opinion is

---

[1] The Court notes that Plaintiff's counsel, Victor N. Makris, has previously asserted this same or similar argument to Texas courts without success.  *Cf. Alix v. Colvin*, No. 4:12-CV-01493, 2013 WL 5785551 (S.D. Tex. Aug. 26, 2013) (Hanks, J.); *Reliford v. Colvin*, No. H-12-1850, 2013 WL 1787650 (S.D. Tex. Apr. 25, 2013); *Brooks v. Astrue*, No. 4:09-CV-2806, 2011 WL 1231605 (S.D. Tex. Mar. 31, 2011) (Hanks, J.); *Copenhaver v. Astrue*, No. A-09-CA-838-SS, 2011 WL 891617 (W.D. Tex. Mar. 11, 2011); *Johnson v. Astrue*, No. H-10-422, 2010 WL 5437262 (S.D. Tex. Dec. 27, 2010); *Lottinger v. Astrue*, No. 4:09-CV-971, 2010 WL 744245 (S.D. Tex. Feb. 26, 2010); *Macias v. Astrue*, No. 4:08-CV-3681, 2010 WL 376268 (S.D. Tex. Jan. 26, 2010).

required when, "*in the opinion of the administrative law judge or the Appeals Council*

[this additional evidence] may change the State agency medical or psychological

consultant's finding that the impairment(s) is not equivalent in severity to any impairment

in the Listing of Impairments.") (emphasis added).

Here, Bluitt points to several laboratory tests that she contends require the ALJ to

seek an additional State agency medical consultant ("SAMC") opinion.  Specifically,

Bluitt refers to evidence that "includes, but is not limited to, laboratory results from July

2012 showing elevated erythrocyte sedimentation rate, a positive Anti Nuclear Antibody

(ANA) titer of 1:1260, when normal is less than 1:40, and an RA factor of 78 (normal is

under 30). . ."  Pl. Br. at 7 (internal citations omitted).  However, Bluitt does not indicate

how or why this evidence is relevant to a Listing nor does she assert how this evidence

might have changed the ALJ's opinion.

To satisfy the requirements of Listing 14.02, Systemic lupus erythematosus

("SLE"), a claimant must produce documented medical evidence of the disease and

satisfy the criteria of either paragraph A or B of the Listing.  *See* Appendix 1

§§ 14.00(D), 14.02.  Paragraph A requires: "Involvement of two or more organs/body

systems, with: (1) one of the organs/body systems involved to at least a moderate level of

severity; and (2) at least two of the constitutional symptoms or signs (severe fatigue,

fever, malaise, or involuntary weight loss)."  *See* Appendix 1 § 14.02.  Paragraph B

requires "Repeated manifestations of SLE, with at least two of the constitutional

symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of

the following at the marked level: (1) Limitation of activities of daily living.

22

(2) Limitation in maintaining social functioning.  (3) Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace."  *Id.*

The determination of whether or not a claimant satisfies the conditions of a listing is "one reserved to the Commissioner."  *See* 20 C.F.R. § 404.1527(d)(2); *see also Cain v. Barnhart,* 193 Fed. App'x 357, 361 (5th Cir.2006).  In the case at bar, while the record reveals a documented history of SLE, Bluitt has not produced sufficient evidence of the "constitutional symptoms or signs" or "major organ or body system involvement" required to satisfy the Paragraph A or B criteria of the Listing.  *See* Appendix 1 §§ 14.00(D)(1)(a), 14.02.  Although the regulations note that patients with SLE often demonstrate "an array of circulating serum auto-antibodies and pro- and anti-coagulant proteins that may occur in a highly variable pattern," proof of this fact alone is insufficient to qualify under the Listing.  *Id.*  The tests and evidence referenced by Bluitt likely would not have changed the SAMC's opinion.  *See Brister v. Apfel*, 993 F. Supp. 574, 577 n.2 (S.D. Tex. 1998) ("In this case, the ALJ did not believe this additional evidence, . . . would disturb his findings.").  Accordingly, the Social Security Regulations do not require that the ALJ obtain an updated medical opinion.  *See* SSR 96-6p at *4; *Dominguez v. Astrue*, 286 F. App'x 182, 186 (5th Cir. 2008) ("the use and consideration of medical expert testimony is solely within the discretion of the ALJ.").

### An Updated Medical Opinion was Unnecessary to Fully Develop the Record

In a similar argument, Bluitt contends that the lack of additional medical expert opinion constitutes a failure to adequately develop the record.  The Court disagrees.  An ALJ "has a duty to fully and fairly develop the facts relative to a claim for disability

benefits." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000).  However, reversible error for an ALJ's failure to develop the record requires a showing of prejudice.  *Id.* Therefore, Bluitt must "adduce[] evidence that might have altered the result." *Id.*  Bluitt has produced no such evidence.

Although Bluitt asserts that "[c]onsultation of an ME would likely have resulted in a different outcome," she provides no argument or citation in support of this assertion. *See Jones v. Astrue*, 691 F.3d 730, 735 (5th Cir. 2012) *cert. denied,* 133 S. Ct. 953, 184 L. Ed. 2d 728 (U.S. 2013) ("A mere allegation that additional beneficial evidence might have been gathered had the error not occurred is insufficient to meet this burden."). Furthermore, while Bluitt has provided medical evidence that indicates she suffers from SLE and has alleged that she suffers from other ailments, she has failed to demonstrate or explain how these ailments would have altered the ALJ's RFC assessment or otherwise impacted her ability to work.  *See Gonzalez v. Barnhart*, 51 F. App'x 484 (5th Cir. 2002) (finding no prejudice where claimant presented no evidence or argument of why she could not perform her past relevant work).  Accordingly, the Court finds that Bluitt has failed to provide any evidence which may have altered the Commissioner's determination and that the facts of Bluitt's claim were fully and fairly developed.

## E. The ALJ Properly Evaluated Bluitt's Credibility

Bluitt asserts a number of arguments contending that the ALJ improperly evaluated her credibility.  First, Bluitt argues that the ALJ "failed to consider the non-exertional impairments of pain and fatigue."  Second, Bluitt argues that, in finding that she was non-compliant with her medication, the ALJ improperly assessed her credibility

24

based upon an inability to afford treatment.   The Court finds these arguments unpersuasive.

### The ALJ Properly Considered Subjective Complaints of Pain and Fatigue

An ALJ is required to consider a claimant's subjective statements of pain, symptoms, and their effects; however, these statements must be corroborated by the objective medical evidence.  *See* 20 C.F.R. § 404.1529(a); *see also Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (quoting *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991)) (While "[t]he ALJ must consider subjective evidence of pain, [] it is within his discretion to determine the pain's disabling nature.").   Here, in considering Bluitt's subjective complaints of pain, the ALJ reasoned that,

> The medical evidence of record demonstrates the claimant has a long-standing history of [SLE].   However, the longitudinal history shows the claimant has remained relatively asymptomatic with few or little symptoms or complaints of severe functional limitations.  The record has been most significant for subjective complaints of chest pain, but there is no chronic history of flare-ups or decreased range of motion of the joints due to complications with lupus.  The claimant has been conservatively treated and has done well on medications.

Tr. 18.   Likewise, in an analysis extending over 4 pages, the ALJ comprehensively discussed Bluitt's medical history in conjunction with her subjective complaints and found that "the objective clinical findings partially support the claimant's subjective complaints, but do not support the alleged severity of the claimant's symptoms or reported functional limitations to the degree that it would preclude work at the medium exertional level."  Tr. 17-21.

The ALJ also considered the fact that Bluitt received unemployment benefits for a period of time *after* her alleged onset of disability.  The ALJ noted that,

> "[O]ne of the most important things for a claimant to show in order to receive unemployment insurance benefits is medical ability to work. . . . Therefore, [] the claimant's statements . . . at the hearing regarding the severity of her impairments is unreliable and entirely not credible, as statements made to another governmental agency directly contradict her current allegations of disability.  To be clear, the undersigned does not find the receipt of unemployment benefits to be conclusive regarding the claimant's application for disability benefits, but rather it is only one of many factors that must be considered in determining whether the claimant is disabled.

Tr. 20.

Thus, in finding Bluitt's allegations not credible, the ALJ considered testimony about her physical condition and daily activities, evidence that Bluitt received unemployment benefits, the findings and conclusions of medical and vocational experts, and the objective medical evidence present in the record.  After a review of the record, the Court finds that substantial evidence supports the ALJ's credibility determination and that the ALJ adequately considered Bluitt's subjective complaints of pain and fatigue.

### *The ALJ did not Improperly Consider Bluitt's Ability to Afford Treatment in Determining her Disability Status*

In his decision, the ALJ found that, "[Bluitt's] history has been significant for complaints of chest pain and lupus flare-ups after periods of noncompliance with medications."  Tr. 19.  Bluitt asserts that she was non-compliant with her medication because she could not afford them.  Therefore, she argues, the ALJ improperly relied upon her inability to pay in finding her subjective complaints not credible.  The court disagrees.

It is well established that "[a] medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling."  *Lovelace v. Bowen*, 813

F.2d 55, 59 (5th Cir. 1987); *see also Bolton v. Apfel*, 237 F.3d 632, at *1 (5th Cir. 2000). "If, however, the claimant cannot afford the prescribed treatment or medicine, and can find no way to obtain it, the condition that is disabling in fact continues to be disabling in law." *Lovelace*, 813 F.2d at 59; *see also Fellows v. Apfel*, 211 F.3d 125, at *3 (5th Cir. 2000) ("It is true that if a claimant cannot afford the prescribed treatment or medicine, a curable, temporary disability is treated as a permanent one."). Importantly, this reasoning presumes the existence of a disabling condition. *See Fellows*, 211 F.3d 125, at *3 (5th Cir. 2000). The inability to afford treatment for a condition that is not disabling is "irrelevant." *Id.*

Here, there is no evidence that the ALJ found Bluitt disabled, yet denied benefits due to a lack of treatment. Instead, in finding Bluitt not disabled, the ALJ relied upon: (1) Bluitt's credibility and motivation; (2) the objective medical and opinion; (3) clinical and laboratory findings; (4) diagnostic tests; (5) the extent of medical treatment and relief from medication and therapy; (6) the claimant's daily activities; (7) the extent, frequency, and duration of symptoms; (8) attempts to seek relief from symptoms; (9) the claimant's earnings record; and (10) all of the evidence of record. Tr. 21; *see also Cornett v. Astrue*, 261 F. App'x 644, 649-50 (5th Cir. 2008) ("The decision to credit the medical evidence to a greater extent than [the claimant's] subjective complaints was valid.").

Contrary to Bluitt's assertion, in the absence of a disabling condition, an ALJ may consider non-compliance with medication, regardless of the ability to pay, to discredit a claimant's subjective complaints of pain. *See Cornett*, 261 F. App'x at 649 (despite allegations of inability to pay, the ALJ was not precluded from relying upon a lack of

treatment as an indication that subjective complaints of pain were not credible where the evidence did not support the claimant's alleged disabilities).  Here, substantial evidence supports the ALJ's conclusion that Bluitt was not under a disability during the applicable time period.  Accordingly, Bluitt's inability to afford treatment is "irrelevant" and the ALJ did not err by considering her non-compliance with medication.  *See Fellows*, 211 F.3d at *3.

## F. The ALJ's Opinion is Consistent with SSR 82-62

Finally, Bluitt asserts that the ALJ's opinion was inconsistent with SSR 82-62, which requires that "[p]ast work experience [] be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work."  SSR 82-62, 1982 WL 31386, at *3 (January 1, 1982).  Specifically, Bluitt argues that the ALJ "never fleshed out [] the actual physical and mental demands" of her past relevant work.  The Court disagrees.

When an ALJ finds that a claimant has the capacity to perform past relevant work, the Social Security Regulations require that the decision contain: (1) a finding of fact as to the individual's RFC; (2) a finding of fact as to the physical and mental demands of the past job/occupation; and (3) a finding of fact that the individual's RFC would permit a return to his or her past job or occupation.  SSR 82-62, at *3; *see also Malik v. Colvin*, No. 4:12-CV-1505, 2013 WL 5781669, at *5 (S.D. Tex. Sept. 6, 2013) (Hanks, J.).

Here, the ALJ found that Bluitt was capable of performing her past relevant work as a security guard and a receptionist because "[t]his work does not require the

performance or work-related activities precluded by the claimant's RFC."   Tr. 21.
Supporting this conclusion, the ALJ found that,

> Herman Litt, an impartial vocational expert, characterized the claimant's past
> relevant work as follows: security guard, light and semi-skilled (SVP 4) (actually
> performed at medium); and receptionist, sedentary and semi-skilled (SVP 4).   The
> vocational expert was asked whether, in his opinion, the claimant could still
> perform her past relevant work [with her RFC], and stated yes to both occupations.
> The undersigned concurs with this opinion and, accordingly, in comparing the
> claimant's [RFC] with the physical and mental demands of this work, the
> undersigned finds that the claimant is able to perform them as actually and
> generally performed.

*Id.*

In reaching the conclusion that Bluitt could perform her prior relevant work, the
ALJ considered Bluitt's hearing testimony, the testimony and conclusions of the VE, and
application materials consisting of "Certified Earnings Records" (Tr. 156-66); a
"Disability Report" detailing the tasks and physical demands of her security guard job
(Tr. 170-73); a "Work History Report" detailing the tasks, responsibilities, and physical
demands of all of her prior relevant work (Tr. 219-26); and several "Sequential
Vocational Guides" classifying the skill and exertional level associated with Bluitt's past
relevant work (Tr. 178, 237, 269).[2]

---

[2] "Adequate documentation of past work includes factual information about those work demands
which have a bearing on the medically established limitations. Detailed information about
strength, endurance, manipulative ability, mental demands and other job requirements must be
obtained as appropriate. This information will be derived from a detailed description of the work
obtained from the claimant, employer, or other informed source. Information concerning job
titles, dates work was performed, rate of compensation, tools and machines used, knowledge
required, the extent of supervision and independent judgment required, and a description of tasks
and responsibilities will permit a judgment as to the skill level and the current relevance of the
individual's work experience."   SSR 86-62 at *3.

Bluitt bears the burden of proving that she is disabled and cannot perform her past relevant work.  *See Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  Bluitt has failed to meet that burden; she simply quotes portions of SSR 82-62 and argues that the ALJ did not comply.  Bluitt provides no indication of how the ALJ's conclusions were deficient, nor does she cite any evidence showing that the ALJ's assessments of Bluitt's past work or RFC were flawed.  While Bluitt may disagree with the ALJ's conclusions, the Court finds that the ALJ's findings of fact were in accordance with SSR 82-62.

Overall, Bluitt has failed to satisfy her burden of proving disability.  Bluitt asks this Court to reweigh the evidence and substitute our judgment for that of the Commissioner.  *See Audler*, 501 F.3d at 447.  The Court cannot provide the requested relief.  The Court finds that the relevant evidence in this case could lead a reasonable mind to accept the conclusion that Bluitt is able to perform her past work.  Accordingly, substantial evidence supports the Commissioner's decision that Bluitt is not disabled.

**CONCLUSION**

The record reveals that the ALJ applied the correct legal standards in denying Bluitt's disability benefits.  Substantial evidence supports the determination that Bluitt was not disabled during the relevant time period.  A review of the pleadings and the record on file reflects that there is no genuine issue of material fact in this case, and summary judgment is therefore appropriate.  FED. R. CIV. P. 56(a), (c).  Accordingly, the Court rules that Bluitt's Motion for Summary Judgment is **DENIED** and the Commissioner's Motion for Summary Judgment is **GRANTED**.

SIGNED at HOUSTON, TEXAS on this 6th day of March, 2015.

_____

GEORGE C. HANKS, JR.
UNITED STATES MAGISTRATE JUDGE

31